486 So.2d 1085 (1986)
Jerry H. WOLFF, Plaintiff-Appellant,
v.
MANVILLE FOREST PRODUCTS CORP., Defendant-Appellee.
No. 17660-CA.
Court of Appeal of Louisiana, Second Circuit.
April 2, 1986.
*1086 Blackwell, Chambliss, Hobbs & Henry by Sam O. Henry, III, W. Monroe, for plaintiff-appellant.
Shotwell, Brown & Sperry by Marshall T. Napper and Michael Ashbrook, Monroe, for defendant-appellee.
Before HALL, NORRIS and LINDSAY, JJ.
LINDSAY, Judge.
Plaintiffs, Jerry H. Wolff and Suzanne Brown Wolff, appeal the trial court judgment which rejected their recovery of certain itemized damages to property which they had leased to the defendant, Manville Forest Products Corporation (Manville) through its predecessor, Olinkraft, Inc. The plaintiffs also appeal the granting of the defendant's reconventional demand to recover one month's rent which was paid after the lease expired. We amend and affirm the trial court judgment.
The lease agreement between the parties covered 65,000 square feet of an 80,000 square foot warehouse built by the lessors. The lease was for a term of five years, beginning January 1, 1974, with a renewal option for five additional years. Olinkraft, and then Manville occupied the premises for the entire primary and extended terms, ending December 31, 1983. The other 15,000 square feet of warehouse space has been occupied by McKesson Chemical since the warehouse was built.
The defendant initially used the warehouse for the storage of carton containers. *1087 Subsequently, Manville discontinued the storage of cartons and began to use the warehouse to store large paper roll stock. Near the beginning of the extended term of the lease, Manville employed Monroe Warehouse Company to help operate the warehouse as a storage facility for the large paper roll stock which was transported from the Manville plant.
The warehouse was designed without an external dock for loading and unloading; therefore, the trucks had to back directly up to the walls of the building underneath the overhead doors. There were bumper pads attached to the retaining walls at each of these loading and unloading "dock" areas to absorb some of the force of the backing vehicles and to avoid direct contact with the wall. Movable steel dock plates were also provided for use in loading and unloading. They were placed on the floor of the building and the floor of the vehicle to bridge the gap between them.
Shortly before the lease expired in December, 1983, a visual inspection of the warehouse premises was made by the owner-lessor, Mr. Wolff, Mr. Al LeBrun, a manager in charge of operations at the warehouse for Manville, and Mr. Smith, the president of Monroe Warehouse Company. The purpose of this meeting was to determine the nature and extent of damages to the warehouse and to determine who would be responsible for the repair of such damages.
The lease agreement contained a provision which stated that:
Upon the termination of this lease for any cause the Lessee shall peaceably deliver up the premises to Lessor in as good a condition as when received, usual wear and tear, damage by the elements, other casualty for which Lessee is responsible at law or as herein provided, condemnation and/or appropriation, excepted.
The lease also provided that the lessors would be responsible for maintaining the premises, inside and out, including foundations, roofs, concrete floors, structural supports, walls, docks, ramps, and parking and loading areas. However, the lease further provided that "notwithstanding the foregoing, should repairs or maintenance be necessitated by specific damage caused by Lessee then same will be borne by Lessee."
Subsequent to the meeting between the parties at the warehouse, certain repairs were made by Manville in an attempt to return the premises to the lessor in "as good a condition as when received." As Mr. LeBrun testified, this included removing some steel from around the floor scale, checking the bolts around the foundation of the building, replacing the panels on the overhead doors, repairing the lighting and heating inside the building, and repairing the steel columns inside the building. However, the Wolffs thereafter filed this suit on September 6, 1984, contending there were certain damages attributable to the lessee that had not been repaired. The plaintiffs enumerated fifteen items of repair work in their petition and contended that they should recover the cost of such repairs from the defendant in the amount of $52,024.
Manville, in its answer to the plaintiffs' petition, denied the plaintiffs' allegations and reconvened contending that it should recover $11,595 from the plaintiffs. The defendant stated that $5,200 had been paid in error as rent for January, 1984 after the lease had expired and that it had also mistakenly paid utility bills for the warehouse for January through June of 1984, totalling $6,395. The defendant contended that it should be reimbursed by the plaintiffs for these amounts.
This suit was tried on December 4 and 5, 1984 in the Fourth Judicial District Court and was taken under advisement. The final judgment granted the plaintiffs $14,208 for some of the itemized damages claimed in their petition, which included the cost of replacing damaged wall "girts," wall panels, and the cost of repairing a damaged canopy over the ramp leading from the warehouse to a railroad siding. The judgment also granted the defendant $4,800 in response to its reconventional demand for the recovery of the January, 1984 rent payment, *1088 but denied the defendant's request to recover the utility payments.
The plaintiffs have appealed from the portion of this judgment which rejected recovery for the other itemized damages and from the granting of defendant's reconventional demand. The plaintiffs contend that the trial court erred in finding that damage to the interior floors of the warehouse was due to "normal wear and tear" rather than to excessive use and abuse by the lessee, in finding that the concrete parking lot damage was due to construction defects rather than abuse by the lessee, in failing to award damages for the bumper pads on the exterior walls of the loading docks, and in granting the defendant's reconventional demand. We will discuss each assigned error separately.
The trial court, in its written reasons for judgment, denied the plaintiffs' claims for damages to concrete, both inside the warehouse and in the parking lot. The court found that construction shortcomings and "usual wear and tear" caused the damages of which the plaintiffs complained.
However, we find that the trial court erred in not allowing the plaintiffs to recover for damages to the concrete inside the warehouse, which consisted of the inside flooring and the concrete found beneath the overhead doors.
As noted by this court in Wilson v. Jacobs, 438 So.2d 1119 (La.App. 2d Cir. 1982) at page 1121:
An appellate court cannot disturb the trial judge's reasonable evaluations of credibility and reasonable inferences of fact. Pierre v. Landry, 341 So.2d 891 (La.1977). The trial judge's findings as to the credibility of witnesses and his findings of fact cannot be disturbed unless clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Steib v. Schwegmann Bros. Giant Super Markets, 396 So.2d 464 (La.App. 4th Cir. 1981).
Although great deference is owed to the trial court's conclusions, nevertheless, after a review of the testimony and evidence in this case we must conclude that the trial court was incorrect in its determination that the damage caused to the concrete portion of the warehouse was due to "usual wear and tear."
Mr. Burt Waldroup testified that he was an employee of John Myers Pump Service, a corporation owned by Mr. Wolff which constructed the concrete portions of the warehouse. Mr. Waldroup stated that he was in charge of building the concrete "retainer" walls, the concrete flooring, and the parking lot adjacent to the building. He explained that he built the retainer walls and the concrete floor according to standard construction methods. The retainer walls were four feet high and eight inches thick with reinforcement bars extending out into the floor area to "tie" the floor to the walls as the concrete was poured. He testified that he attempted to maintain a six inch depth for the floor throughout the building. Although he did not participate in designing the building, Mr. Waldroup used the plans prepared by Mr. Pohlman of Pohlman & Willbanks Contractors, Inc. to construct the walls and foundation of the warehouse so that these structures would coordinate with the metal building once it was erected.
Mr. Edward J. Pohlman, III, a civil engineer with Pohlman & Willbanks Contractors, Inc. was called by the plaintiff and accepted by the court as an expert in the construction and design of metal buildings. Mr. Pohlman testified that his company designed the plans for the warehouse in question, except for the concrete work which was performed by John Myers Pump Service. Mr. Pohlman testified that before trial, he was asked to examine the warehouse and to make a list of items that needed to be repaired which had been damaged beyond ordinary wear and tear. This list included calculations which estimated the cost of repairing or replacing the items listed. A determination was made of what material was needed to do the work and the estimated man hours and time involved to complete each particular item.
*1089 Mr. Pohlman testified that approximately 501 square feet of concrete flooring inside the building would have to be removed and replaced at an estimated cost of $7,210. He stated that the damage was primarily in heavy traffic areas inside the building and could have been caused by forklifts carrying concentrated heavy loads. The areas where these forklifts made sharp quick turns caused a greater concentration of weight on one particular area of the concrete floor, which caused it to crack.
With respect to the concrete beneath the seven overhead doors, Mr. Pohlman stated that it was his opinion that the concrete in that area was damaged due to heavy loads on the forklifts as they transported the materials from the trailers parked at those entrance doors into the warehouse itself. Mr. Pohlman estimated that the cost to remove and replace this concrete would be $8,498. He stated that although he could not estimate the life expectancy of concrete in such a building, he opined that the damage in this instance had occurred gradually and was due to the heavy loads on the forklifts which transported the stored materials into and through the warehouse over well-traveled areas.
Mr. LeBrun, a manager for Manville, testified that the lease did not provide any specifications or limitations on the loads that were to be placed in the warehouse. It was his opinion that the deterioration of the concrete floor was not due to the fault of Manville, but due to the normal wear and tear that would occur upon such a floor. With respect to the concrete at the seven overhead doors, Mr. LeBrun did not feel that this damage was the responsibility of the defendant, although he stated that this damage could have occurred as a result of trucks backing their trailers into the wall to unload.
Mr. LeBrun explained that during the first six and one half years that Manville occupied the warehouse, paper containers were stored there which were packed in corrugated cases and palletized, weighing approximately 1,800 pounds. Subsequently, large paper roll stock was stored in the warehouse, using the same amount of floor space, but weighing approximately 4,000 pounds. Mr. LeBrun testified that these large paper rolls were stacked one on top of the other, up to a maximum height of four rolls.
Mr. John Smith, the president of Monroe Warehouse Company, was of the opinion that the concrete in the building was inadequate to support the loads. With respect to the loading dock area, he noted that the loading dock area was approximately eight inches below the normal truck height and that the steel dock plates were used to overcome this eight inch variance. The pounding of the metal on the concrete added to the deterioration.
Mr. Glenn Strange, a truck driver/warehouseman for McKesson Chemical was called by the plaintiffs to testify. He stated McKesson and Manville used the same procedures to load and unload their trailers and he noted that the concrete beneath McKesson's overhead doors was in good condition. He stated, however, that he had seen Manville trucks backing their trailers into the walls beneath their overhead doors, causing damage to the concrete there.
Mr. Wolff, the owner and lessor of the warehouse, testified that he had attempted to patch the interior floors of the warehouse on one or two occasions, as well as two of the loading dock areas beneath the overhead doors. He testified as to the cost of these repairs but stated that these costs were not included in the estimates presented by Mr. Pohlman which were used by the plaintiff in his calculations set forth in the petition.
Dr. Dean Clyde McKee was presented by the defendant as an expert in concrete structures, such as foundations. His qualifications included a bachelor of science and a master's degree in civil engineering, with experience in teaching structural engineering and laboratory testing of plain concrete. He received his Ph.D. with a major in structures and a minor in foundations and theoretical and applied mechanics. Dr. McKee explained he was asked by the defendants *1090 to examine and evaluate the concrete structures in this warehouse. He stated his report included the results of tests made by Professional Services Industrials, Inc. which provided him with information relative to concrete strength and compaction strength of the soil at the site. Dr. McKee testified that three concrete cores were obtained from the interior of the building and that one soil sample was taken to test the subgrade of the foundation.
Dr. McKee's testimony was consistent with that of Mr. Pohlman as to the approximate total area of the interior floor of the warehouse which was damaged. He stated that the majority of the floor was in good shape. His report which was admitted into evidence revealed that the floor contained only localized areas of cracking which could be a result of (1) low concrete strength (2) inadequate subgrade support for the slab or (3) excessive loads to the floor slab. He stated that upon examining the test results which indicate corrected compressive strength of the three concrete cores, he found the average value to be approximately 3,900 psi which would be adequate for normal warehouse loads. He stated that the average thickness of the warehouse floor was 4.9 inches and that this corrected compressive strength was appropriate for that width of floor. He also revealed that the subgrade test performed on the soil extracted from underneath the floor in the warehouse was to determine the maximum dry density of the soil in that area. The test results indicated 93.7 percent compaction which was adequate support for this type of floor slab.
The report concluded that there was no evidence that the slab design or construction were in any way inadequate and that the areas of cracking found in the interior floor were due to excessive use by the occupants of the warehouse. Although Dr. McKee stated that tests could not be performed on the areas that were damaged, as crumbling concrete could not be evaluated, he stated that the approximately 500 square feet concerned, evidenced destruction by those using the warehouse. "If you talk about wear of a warehouse floor, you will see quite often surface wear and removal of just concrete surface. What you arethis is destruction. This concrete has been destroyed in this area." Dr. McKee also stated that in the areas of the doorways where there were heavy traffic loads, the damage was greater as opposed to the concrete areas where a great amount of weight was placed, but not transported.
Raymond Bullock, a supervisor of shipping for Manville testified that several places in the aisles of the floor inside the warehouse had started cracking and breaking up soon after Manville had entered the premises in 1974. He stated that this was prior to the time that Manville began storing large roll paper stock in the warehouse.
Mr. Dale Allen Page was then called on rebuttal by the plaintiff and testified that he was a forklift operator for Monroe Warehouse Company. He stated that with respect to the interior floor of the warehouse, the concrete had a tendency to break down in the aisles where the heavy traffic occurred. He stated that the concrete in the loading dock areas was damaged due to the "falling" of the dock plates that bridged the gap between the truck and the warehouse. He stated that the dock plate would often slip out, fall, and chip the concrete in that area. He stated that the weight of the forklift as it came out of the truck also intensified the load on the concrete at that point causing further damage. He stated that this occurred due to the variance in height between the trailers and the loading dock walls. As the forklifts exited the trailer they had a tendency to push out the dock plates that covered the gap, causing them to hit the concrete.
Mr. Wolff, also on rebuttal, testified that the loading dock area walls had been built to this height due to a specific request by Olinkraft in 1973 and that the present variance in the height between the trailers and the walls was due to changes in the design of trailers since that time.
The trial court in its written reasons for judgment in this case, determined that *1091 there was no limitation of weight or "load" contemplated by the parties at the time of the lease and that the movement and storage of heavy paper and paper products was the "normal" use envisioned by the contract. The court stated that the three core samples taken at random places inside the warehouse revealed concrete slab thickness varied substantially from 4.0 to 5.3 inches. The court stated that while three cores may not be sufficient for specific findings applicable to the whole slab, those three certainly cast doubt as to the construction method and uniformity of the floor. The court noted that the evidence that there may have been "excessive" weight on the forklifts inside the warehouse did not convince the court of misuse by the lessee or of serious contribution by that cause to the deterioration of the concrete. Therefore, the plaintiff's demands were rejected.
However, an overwhelming portion of the testimony and the evidence in this case, including photographs of the building and the testimony and report of Dr. McKee, the defendant's own expert, indicate that the damage to the concrete comprising the interior floor of the warehouse and that comprising the wall of the loading dock areas underneath the overhead doors, was caused by improper or excessive use by the occupants of the building and was not the result of normal wear and tear. The scientific evidence that was presented to the court indicated that the strength of the concrete used in constructing the building was adequate for normal use and that the majority of the inside floor was in good condition. The results of these scientific tests led to a finding by Dr. McKee that the damage had to be caused by excessive use by the occupants of the warehouse. Other witnesses testified that the damage to the inside concrete floor occurred in the heavily traveled traffic areas inside the building, which included the areas in which the forklifts with heavy loads entered the building through the loading dock areas underneath the overhead doors. Although the scientific evidence did not deal directly with that area of the warehouse, there was sufficient testimony by both plaintiff and defense witnesses that such damage could occur in this area by trucks backing into this wall and by the excessive loads on forklifts traveling over the steel dock plates adding further force to the concrete there. We find that the trial court erred in not granting the plaintiff $15,708 to remove and replace this concrete.
The plaintiff next contends that the trial court erred in finding that damage to the parking lot was caused by defects in design and construction rather than by excessive use by the lessee. We disagree with the plaintiff's contention, however, and affirm the trial judge's decision in this respect.
The evidence in the record supports the trial court's conclusion that the parking lot was not properly constructed, thus explaining the very apparent deterioration.
Mr. Waldroup, the construction foreman, testified as to the construction of the parking lot. He stated again that he used accepted methods in constructing the lot with redwood expansion joints and steel reinforcements. He estimated that the eleven to twelve inch drop in the elevation of the lot was sufficient for drainage and that underground drainage was not provided.
Dr. McKee testified that upon his examination of the parking lot on March 16, 1984 he found it to be in "horrible shape." Although he stated that the corrected compressive strength of the concrete was good, the concrete was far too thin for the type of use the parking lot was receiving. This testimony was supported by his report.
His report revealed that a combination of factors were responsible for the condition of the parking area: (1) poor drainage, (2) wooden construction joints, (3) pumping of the subgrade and (4) slab thickness.
The report revealed that the elevation of the lot was such that water would have a tendency to pond near the parking lot-warehouse wall junction, as this was an area of lower elevation. Dr. McKee testified that to achieve proper drainage, there should be a drop in elevation of 1/8 of an inch per foot.
*1092 In this parking lot, there was a drop of only 1/32 of an inch per foot. He stated that because this was below the minimum that was usually found in parking lots, it explained why the water did not drain off very quickly. He stated that instead the water would remain on the slab, soak the wooden joints, and permeate the subgrade.
His report also explained the problems in using wooden construction joints. It stated that the joints do not provide load transfer across the joint from one slab to another. Without load transfer, the corners of each slab panel tend to curl upward unsupported and act as cantilevers which are easily broken.
The report also explained that water could penetrate the subgrade of the parking lot as the concrete shrinks away from the wooden joints.
With excess moisture in the subgrade, the pumping action that occurs when the slab is loaded will cause damage. Highway engineers have recognized for many years that pumping action contributes to the deterioration of pavements, and therefore utilize design and construction procedures to avoid its occurrence.
In this respect, Dr. McKee testified that no matter how good the concrete slab is in a parking area, "it really is only as good as the subgrade conditions." He stated that he could not find any subgrade specifications or data in the parking lot plans.
Dr. McKee also noted the concrete slab in this lot was only approximately five inches thick. His report explained that this was likely to be too low to insure adequate performance for its design life. Dr. McKee stated a parking lot that services a warehouse and receives correspondingly heavy traffic should have a slab thickness closer to seven or eight inches. Therefore, it was his conclusion that poor drainage and wooden construction joints were the primary factors responsible for the cracking and deterioration in the concrete parking area slab. He found that this was inevitable in light of the design and construction of the slab and was not due to excessive use by the warehouse occupants. He stated that he thought the deteriorating conditions and the breaking up of the concrete could be expected within the first few years of use of the parking lot.
Glenn Strange and Dale Page also testified concerning the parking lot damage. Although they testified as to some occasions when trailers were overloaded or mishandled on the lot, they also noted that water did not drain properly from the lot.
We agree with the trial court's conclusions that a preponderance of the evidence presented with respect to the parking lot damage indicated that there was no abuse or excessive use by the lessee. It is apparent that the substantial deterioration and cracking in the parking lot is a result of design and construction defects. "Usual wear and tear" accentuated these preexisting problems. Accordingly, we affirm the trial court's denial of the plaintiff's demands to recover for damages to the concrete parking lot.
The plaintiffs next contend that the trial court erred in not awarding damages for the exterior bumper pads at the loading dock areas. The trial court noted that at one point Mr. Wolff had agreed to furnish the bumper pads for the loading areas if the lessee would install them. However, the bumper pads were never provided. Mr. Wolff did not refute this evidence.
Mr. Waldroup testified that he originally attached the bumper pads to the building by means of bolts that had been set in the side retaining walls underneath the overhead doors. He stated that on one occasion while he was working for the plaintiffs, he changed these pads at Olinkraft's request.
Although, Mr. Pohlman testified that bumper pads, if not abused, should have had a life expectancy in excess of twenty years, Mr. LeBrun stated that underneath the overhead doors that were frequently used, the bumper pads often lasted less than one year. Mr. LeBrun said that he did have a conversation with Mr. Wolff about getting these bumper pads replaced, but that they were never provided. He also stated that it was his opinion that *1093 these pads had a tendency to fall from the retaining wall because the bolts to which they were attached were not long enough. Due to this, over a ten year period of normal use, the bumper pads would be knocked down.
Mr. Wolff testified that he never attempted to repair the bumper pads. He stated that he put them there for the defendant to use, but that he should not have been required to maintain them, as the defendant was the party that damaged them.
The trial court was correct in its conclusion that the lessors had indicated that they would take the responsibility for replacing the bumper pads. This was supported by Mr. Wolff's discussion with Mr. LeBrun and by Mr. Waldroup's testimony that he, at one point, had replaced the bumper pads. Although there was some testimony that the trucks had a tendency to back into the walls causing damage to these pads, it appears that the normal use of these bumper pads and the way they were attached to the wall, caused the damage. Therefore, the trial court correctly denied recovery for these pads.
The plaintiffs' final contention is that the trial court erred in granting the defendant's recovery of the payment for the rent for January, 1984. The plaintiffs contend that Manville was still in control of keys to the warehouse, had made a deposit for utilities which were still being paid after the first of January, 1984, and had stored a quantity of roll stock in the warehouse during January, 1984. Therefore, the leased premises were still being used and occupied by the defendant, obligating it to pay the monthly rental of $4,800. Plaintiffs contend that this occupancy reconducted the lease.
We disagree with the plaintiffs' contention. The evidence shows that Manville had moved all of its stock from the leased premises by the end of December, 1983. As noted by the trial court, the Monroe Warehouse Company stored products for the lessee at its own facilities under other contracts and its manager testified that it was conceivable that someone in his organization may have taken some of the lessee's products briefly to the subject warehouse after the lease expired. If that occurred, it was not the lessee's responsibility. The defendants had advised the plaintiffs that they would not occupy the leased premises past December, 1983, which was acknowledged by Mr. Wolff. In this case, the possibility that some of the defendant's personnel were in the warehouse making repairs past that time did not indicate a use of the premises for which a rental obligation would be owed. Therefore, the trial court was correct in granting the defendant's recovery of the $4,800 rental for January, 1984.
Therefore, in summary, we affirm the judgment of the trial court in its entirety with the exception of the specific amount which is awarded to plaintiffs and against the defendant for damages to the concrete flooring of the warehouse. The trial court judgment is therefore amended in this respect, and as amended is affirmed.
The trial court judgment of May 8, 1985, is hereby amended to recast the first paragraph after the preamble as follows:
IT IS ORDERED that there be judgment herein in favor of plaintiffs, Jerry H. Wolff and Suzanne Brown Wolff against defendant, Manville Forest Products Corporation in the principal sum of $29,916, with legal interest from date of judicial demand until paid, and otherwise rejecting all other demands of plaintiffs, including attorney's fees.
In all other respects, the trial court judgment is affirmed. The costs of this appeal are apportioned equally between plaintiffs and defendant.
AMENDED AND AFFIRMED.